# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  48112-0-II |
| Respondent, | |
| v. | |
| SHAWN MICHAEL TILLERY, | UNPUBLISHED OPINION |
| Appellant. | |

WORSWICK, P.J. —A jury returned verdicts finding Shawn Tillery guilty of second

degree assault, violation of a no-contact order, and third degree theft.[1]  Tillery appeals from his

second degree assault conviction and sentence, asserting that the trial court (1) erred by refusing

to instruct the jury on self-defense, (2) failed to enter required written findings and conclusions

in support of an exceptional sentence, and (3) improperly calculated the length of his

incarceration term for that offense.  Tillery also requests that we waive the imposition of costs on

appeal should the State prevail.  We affirm Tillery's second degree assault conviction and

sentence but exercise our discretion to waive appellate costs in this matter.

---

[1] The jury could not reach a unanimous decision on Tillery's charge of first degree burglary.  The
trial court declared a mistrial as to that count, and Tillery later pleaded guilty to residential
burglary in exchange for the State dropping the first degree burglary charge.  Tillery does not
appeal from his residential burglary conviction.

FACTS

Tillery and Corrina Twisselman dated for approximately two and a half years and are the parents of LT; Twisselman also has an older son, CM.[2] Twisselman ended the relationship in January 2014 and stated that she delivered Tillery's belongings to his mother's house that same month. On January 14, 2014, Twisselman was named as the protected party in a domestic violence no-contact order entered against Tillery. The no-contact order prohibited Tillery from having any contact with Twisselman and prohibited him from being within 500 feet of her residence. Tillery was aware of the no-contact order and of its prohibitions.

On March 16, 2014, Twisselman spent the evening with CM and her then boyfriend, Christopher Martin. While the group ate dinner at a restaurant in Tacoma, Twisselman saw Tillery's brother. Shortly thereafter, Twisselman started receiving text messages from Tillery stating that he was coming to the restaurant. Martin was outside the restaurant when Tillery arrived. Tillery confronted Martin. Twisselman came outside, exchanged words with Tillery, and called the police. Tillery left before the police arrived.

After picking up LT from Tillery's mother's home, Twisselman, Martin, and the children returned to Twisselman's apartment. CM slept in his bedroom, while Martin and Twisselman slept in the master bedroom with LT sleeping in a crib located next to the bed. Twisselman locked her bedroom door before going to sleep. Twisselman stated that she also routinely locked her apartment's front door and sliding back door every evening. Shortly after 3:00 a.m. the next morning, Tillery began sending Twisselman hostile text messages, to which she did not respond.

---

[2] At the time of trial, LT was 2 years old and CM was 8 years old.

Twisselman stated that she woke up to her bedroom door being kicked in and a light being turned on. Twisselman saw Tillery standing in her bedroom doorway holding a kitchen knife with a seven-inch blade. She woke Martin and grabbed her phone to call 911. Tillery then lunged at Martin and a struggle ensued between the men, during which Tillery stabbed Martin several times as Martin was defending himself.

Martin stated that he woke up to a loud noise, sat up, and saw Tillery standing in the doorway. Tillery asked Martin, "[W]hat the [expletive] are you doing here?" Report of Proceedings (RP) at 198. Martin heard Twisselman yell, "He has a knife." RP at 198. Martin then saw Tillery raising the knife up in his right hand, at which point Martin lunged for Tillery's right arm to try to control the knife. During the ensuing struggle between the men, Martin was stabbed once in his armpit, once on top of his left shoulder, twice behind his left shoulder, and once on the back of his neck. The knife blade broke off the handle when it struck Martin's shoulder bone. The two men continued to wrestle around the apartment until Tillery eventually ran away. While Martin was waiting for an ambulance to arrive, he noticed that some of his possessions had been taken, including his laptop computer.

Police officers responded to Twisselman's apartment complex shortly after 5:00 a.m. While outside the apartment, Officer Mark Waters saw a shirtless man matching Tillery's description walking "light-footed" as if trying to avoid making noise. RP at 240. Waters lost sight of the suspect, but eventually saw the man, later identified as Tillery, hiding in some bushes. After Tillery was arrested, he told Officer Kenneth Smith that "he knew he was in trouble and he knew he should not have gone to the apartment." RP at 264. Tillery also told Smith that he entered the apartment through an unlocked back sliding door, saw an army uniform

3

on the living room floor and thought, "What the [expletive]," before entering the back bedroom where a male had a knife that they fought over. RP at 264-65. When Smith asked Tillery where the knife was at, Tillery told him he "didn't know where the knife was at because he didn't stab anybody." RP at 265. Police later searched Tillery's vehicle and found items taken from Twisselman's apartment, including Martin's laptop computer.

The State charged Tillery with first degree burglary, second degree assault, violation of a no-contact order, and second degree theft. The matter proceeded to jury trial at which Twisselman, Martin, and police officers testified consistently with the facts above.

Tillery testified about his version of events. According to Tillery, he was living with Twisselman in her apartment on the date of the incident, notwithstanding the no-contact order prohibiting such conduct. Tillery's brother and mother also testified that Tillery was living at Twisselman's apartment. Tillery admitted that he was angry about Twisselman being out with another man that evening and that he had confronted them at the restaurant. He stated that he went to the apartment early that next morning to retrieve some of his possessions. He explained that he went to retrieve his possessions early the next morning because he did not want to argue with Twisselman. Tillery admitted that he did not have a front door key and that he entered the apartment through the back sliding door, which he stated did not have a functioning lock. Tillery took a laptop computer and other items that he mistakenly believed belonged to him. He brought those items to his car and then returned to the apartment to retrieve some of his clothes from inside of Twisselman's bedroom. On his way to the bedroom, Tillery saw Martin's army uniform lying on the floor. Because Twisselman's bedroom door was locked, Tillery retrieved a knife to pry it open.

4

Tillery testified that he pried the bedroom door open with the knife, turned on the light, and saw Martin lying naked on the bed next to Twisselman. Tillery yelled, "What the hell is going on?" RP at 606. Martin sat up and tackled him. Tillery then pushed Martin into a wall, saw that Martin's neck had been cut, and tried to run away, but Martin kept trying to tackle him and hold him down. Tillery eventually dropped the knife and ran outside, at which point his shirt ripped off when it got tangled in some sticker bushes. Tillery stated that he had lied to officers about Martin having the knife because he "saw the cut on [Martin's] neck . . . [and] didn't want to make it seem intentionally that [he] inflicted some damage to him." RP at 619. Tillery admitted that he did not provide Twisselman's address as his own when he was booked at jail, stating that he instead provided his aunt's address because of the no-contact order.

Defense counsel requested the trial court to instruct the jury on the law of self-defense, which the trial court denied.[3] The jury returned verdicts finding Tillery guilty of second degree assault and violation of a no-contact order. Regarding the second degree assault charge, the jury returned special verdicts finding that Tillery committed second degree assault by assaulting Martin with a deadly weapon, that he was armed with a deadly weapon when committing the crime, and that he committed the crime shortly after being released from incarceration. Additionally, the jury found Tillery not guilty of second degree theft but guilty of the lesser-included crime of third degree theft. The jury could not reach a unanimous verdict on the second

---

[3] Although the trial court did not explicitly state on the record its reason for declining the instruction, it appears from the context of the attorneys' arguments that its ruling was based on a factual dispute.

5

degree burglary charge, and the trial court declared a mistrial as to that charge. Tillery appeals

from his second degree assault conviction and sentence.

## ANALYSIS

### I. SELF-DEFENSE

Tillery first contends that the trial court erred by refusing to provide a self-defense jury

instruction. Because the evidence at trial, when viewed in a light most favorable to Tillery, did

not support instructing the jury on self-defense, we disagree.

A defendant is entitled to have the jury instructed on self-defense only if there is some

evidence to support the theory. *State v. Walden*, 131 Wn.2d 469, 473, 932 P.2d 1237 (1997). In

determining whether some evidence supported instructing the jury on self-defense, we review the

entire record in a light most favorable to the defendant. *State v. Callahan*, 87 Wn. App. 925,

933, 943 P.2d 676 (1997).

There are three elements to a claim of self-defense: (1) the defendant subjectively feared

imminent danger of bodily harm, (2) the defendant's belief was objectively reasonable, and (3)

the defendant exercised no more force than reasonably necessary. *State v. Werner*, 170 Wn.2d

333, 337, 241 P.3d 410 (2010). If the evidence fails to support any one of these elements, the

defendant is not entitled to present a self-defense theory to the jury. *State v. Walker*, 136 Wn.2d

767, 773, 966 P.2d 883 (1998). With regard to the third element, a defendant may only use as

much force in self-defense as "what a reasonably prudent person would find necessary under the

conditions as they appeared to the defendant." *Walden*, 131 Wn.2d at 474.

Additionally, "a self-defense instruction is not available to an aggressor." *State v.*

*George*, 161 Wn. App. 86, 96, 249 P.3d 202 (2011) (citing *Walden*, 131 Wn.2d at 482

(Talmadge, J., dissenting)); *see also State v. Currie*, 74 Wn.2d 197, 198, 443 P.2d 808 (1968) (In prosecution for assault, trial court properly refuses to instruct on self-defense where "[t]he undisputed evidence clearly establishes that the defendant was the aggressor and precipitated the incident in question."); *State v. Davis*, 64 Wn. App. 511, 518-19, 827 P.2d 298 (1992) (Self-defense is unavailable to a defendant whose "actions precipitated or provoked the altercation which necessitated his use of force."), *reversed on other grounds*, 121 Wn.2d 1, 846 P.2d 527 (1993).

Our standard of review depends on the reason the trial court refused to grant Tillery's requested self-defense instruction. *Walker*, 136 Wn.2d at 771. If the trial court declined the self-defense instruction based on a factual dispute, we review its decision for abuse of discretion. *Walker*, 136 Wn.2d at 771-72. But if the trial court declined the self-defense instruction based on a ruling of law, we review its decision de novo. *Walker*, 136 Wn.2d at 772. Here, it appears that the trial court refused Tillery's proposed self-defense instruction based on the factual determination that he was the aggressor to an altercation necessitating his use of force. Accordingly, we review the trial court's decision to decline the self-defense jury instruction for an abuse of discretion.

Tillery contends that, when viewed in a light most favorable to him, the evidence at trial could establish that he did not strike Martin with the knife until after Martin had lunged at him in the bedroom. He thus claims that he was entitled to a self-defense instruction so the jury could

determine whether his use of force was reasonable in light of being lunged at by Martin. Tillery's claim fails for two primary reasons.[4]

First, even viewing the evidence in a light most favorable to Tillery, his admitted conduct clearly "precipitated or provoked the altercation which necessitated his use of force." *Davis*, 64 Wn. App. at 518-19, *reversed on other grounds*, 121 Wn.2d 1. Tillery admitted that he was upset and had confronted Twisselman about her being out with another man, and it is uncontested that he had sent her hostile text messages shortly before entering her apartment. Although claiming that he lived at Twisselman's apartment in violation of the no-contact order, Tillery also admitted to entering the apartment through the sliding back door because he did not have a key. Finally Tillery admitted that, after seeing Martin's army uniform on the floor, he broke into Twisselman's locked bedroom with a knife and yelled at Martin while he lay naked and sleeping. This admitted conduct clearly provoked Martin's response in lunging at Tillery and, thus, Tillery was not entitled to claim self-defense. *Currie*, 74 Wn.2d at 198. Accordingly, we hold that the trial court did not abuse its discretion in denying Tillery's self-defense jury instruction request based on his status as the aggressor to the ensuing altercation.

Alternatively, Tillery was not entitled to a self-defense instruction because the evidence, when viewed in a light most favorable to him, could not establish that any reasonably prudent person in his situation would have found it necessary to strike a naked and weaponless Martin

---

[4] Because Tillery's self-defense claim may be resolved based on his status as the aggressor and based on his disproportionate use of force, we do not address the State's novel collateral estoppel argument—that Tillery is collaterally estopped from claiming that the trial court erred in refusing his self-defense instruction because he *subsequently* pleaded guilty to residential burglary and, thus, conceded in his plea that he was the aggressor.

with a seven-inch bladed knife. *Walden*, 131 Wn.2d at 474. Accordingly, in addition to his status as the aggressor, Tillery was not entitled to a self-defense instruction on this basis as well.

## II. EXCEPTIONAL SENTENCE FINDINGS

Next, Tillery contends that the trial court erred by failing to enter written findings of fact and conclusions of law in support of his exceptional sentence as required under former RCW 9.94A.535 (2013). He thus requests that we remand to the trial court to enter the required written findings and conclusions. This assignment of error appears to be an oversight, however, as the trial court entered the required written findings and conclusions on November 3, 2015. Because Tillery does not raise any contentions with the November 3 findings and conclusions, we do not further address them.

## III. SENTENCE CALCULATION

Next, Tillery contends that the trial court erred in calculating his incarceration term for second degree assault and requests we remand for correction of his sentence. We disagree.

Here, the trial court stated at sentencing that it was imposing a 36-month exceptional sentence for Tillery's conviction of second degree assault based on the jury's rapid recidivism findings plus an additional 12 months flat time for the deadly weapon sentencing enhancement. The trial court's written findings of fact and conclusions of law in support of Tillery's exceptional sentence also state that the trial court was imposing a 36-month exceptional sentence based on the rapid recidivism finding and an additional 12 months for the deadly weapon

finding.[5]  And Tillery's judgment and sentence form also states that the trial court was imposing a total of 48 months of confinement based on a 36-month base sentence plus 12 months for a sentence enhancement.

Tillery does not contend that the trial court lacked authority to impose a 36-month exceptional sentence plus an additional 12 months for the deadly weapon sentence enhancement. Instead, he appears to contend that the trial court intended to impose a 24-month exceptional sentence for the deadly weapon finding plus a 12-month enhancement for the rapid recidivism finding, for a total of 36 months of incarceration.  Tillery is mistaken.

The trial court's November 3 written findings and conclusions, which Tillery does not challenge, clearly demonstrate that it was imposing a 36-month exceptional sentence based on the rapid recidivism finding plus an additional 12 months for the deadly weapon enhancement, for a total of 48 months of incarceration.  Tillery misreads the portion of section 4.5 of his judgment and sentence imposing 12 months of flat time consecutive to his 36 months of confinement as referring to the jury's rapid recidivism finding when it plainly referred to the deadly weapon enhancement.  Section 4.5 of Tillery's judgment and sentence states in relevant part, "A special finding/verdict having been entered as indicated in section 2.1, the defendant is sentenced to the following additional term of total confinement in the custody of the Department of Corrections: 12 months on Count No. II."  Clerk's Papers at 144.  And Section 2.1 of Tillery's judgment and sentence contains a checked box referring to the jury's deadly weapon finding and

_____

[5] The trial court mistakenly failed to check a box on Tillery's September 3, 2015, judgment and sentence indicating that it was imposing an exceptional sentence.  The trial court corrected this omission by an agreed order on November 3, 2015, entered *nunc pro tunc* to September 3. Tillery does not raise any contentions with regard to the omission or with the order correcting the omission.

does not reference the rapid recidivism finding. Accordingly, Tillery fails to demonstrate any error with regard to his sentence.

## IV. APPELLATE COSTS

Finally, citing to *State v. Sinclair*, 192 Wn. App. 380, 367 P.3d 612, *review denied*, 185 Wn.2d 1034 (2016), Tillery requests that we waive appellate costs due to his inability to pay such costs. In light of Tillery's indigent status, and our presumption under RAP 15.2(f) that he remains indigent "throughout the review" unless the trial court finds that his financial condition has improved, we exercise our discretion to waive appellate costs in this matter. RCW 10.73.160(1).

We affirm Tillery's second degree assault conviction and sentence but exercise our discretion to waive costs on appeal.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Worswick, P.J.

We concur:

Johanson, J.

Sutton, J.